IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JEREMY BOYNTON,

                 Plaintiff,

v.                                           OPINION and ORDER

ELIZABETH J. KAEDER-SCHNEIDER[1]         23-cv-368-wmc
and MATTHEW O. MUTIVA,

                 Defendants.

---

Representing himself as a prisoner incarcerated by the Wisconsin Department of Corrections ("DOC"), plaintiff Jeremy Boynton was granted leave to proceed against two correctional officers for failing to protect him from self-harm during separate incidents on February 24 and 25, 2020. (Dkt. #7.) Defendants have filed a motion for summary judgment, arguing that plaintiff's claims lack merit and that they are further entitled to qualified immunity. (Dkt. #23.) After considering all of the pleadings and exhibits in the light most favorable to plaintiff, defendants' motion for summary judgment will be granted for the reasons explained below.

---

[1] Spelled as "Kaeder-Schnieder" in the plaintiff's complaint and elsewhere in the pleadings, her personal declaration indicates that the correct spelling is "Kaeder-Schneider." (Dkt. #29, at 1.) Accordingly, the court adopts "Kaeder-Schneider" in this opinion and the clerk's office is directed to correct the caption of this case accordingly.

UNDISPUTED FACTS[2]

Plaintiff Boyton is presently in custody at the Oshkosh Correctional Institution. At all times relevant to his complaint, however, plaintiff was confined in the Alpha Unit at the Wisconsin Secure Program Facility ("WSPF"), where defendants Elizabeth Kaeder-Schneider was a support officer and defendant Matthew Mutiva was a sergeant.

**A. Relevant Events on February 24, 2020**

On February 24, 2020, Officer Kaeder-Schneider was passing out mail to inmates in Alpha Unit. As she was passing by his cell, Boynton alleges that he asked to speak with her about his suicidal thoughts. Boynton claims that Kaeder-Schneider promised to speak with him after delivering the mail, but she never returned.

Approximately twenty minutes after he spoke with Kaeder-Schneider, plaintiff took some pills that were in his cell. Another inmate informed Sergeant Mutiva that Boynton had taken some pills, prompting Mutiva to proceed to Boynton's cell and ask if he had taken anything. Although Boynton denied that he had and stated he was okay, Mutiva notified a supervisor anyway and two other officers then escorted Boynton to the Alpha Health Services Unit. After he was evaluated by a registered nurse, Boynton was further transported to the Boscobel Hospital for evaluation in the emergency room.

Upon assessment at the Boscobel Hospital, plaintiff did not appear to be in acute distress and his vital signs were stable. Although Boynton told staff in the emergency

---

[2] Unless otherwise indicated, the following undisputed facts set forth in this section are taken from proposed findings of fact submitted in compliance with the court's procedures on summary judgment as provided to the parties with the pretrial conference order.

2

department that he had ingested 24 ibuprofen pills, as well as an unknown number of acetaminophen tabs, lab tests showed that he had an acetaminophen level of less than 5 micrograms per milliliter (ug/mL). According to Dr. Daniel LaVoie, who is employed by the DOC's Division of Adult Institutions Bureau of Health Services ("BHS") as its Medical Director, these lab results reflect that he had ingested no acetaminophen. Although lab tests are generally drawn at four-hour intervals in the event of a medication overdose, Boynton then asked to leave the hospital against medical advice and was discharged to return to WSPF without a repeat lab draw. Moreover, given the initial lab report, Dr. LaVoie explains that a repeat lab draw likely would have shown the same results.

Boynton admits not advising Sergeant Mutiva that he was having thoughts of self-harm on February 24, nor was Mutiva so advised by any other staff member. As for Officer Kaeder-Schneider, she does not recall Boynton making any statements that would have prompted her return to his cell after finishing the mail delivery on February 24. Had Boynton expressed suicidal thoughts, Kaeder-Schneider further avers she would have reported them to the unit sergeant or another supervisor consistent with DOC protocol. Kaeder-Schneider also explains that she would not have been able to go into his cell alone to stop him from attempting to self-harm, but would have had to wait for other correctional staff members to arrive under that same protocol.

B. Relevant Events the Next Day

After his return to WSPF, Boynton was restricted from having medication on his person (a Keep on Person ("KOP") restriction) and placed under clinical observation.

3

However, prison logbook entries show that Boynton was removed from clinical observation at 9:10 a.m. on February 25, 2020, and placed back in his cell at 9:40 a.m. Plaintiff further alleges that his regular cell had not been searched.

Sergeant Mutiva did not report for work until 2:00 p.m. on February 25th. At that time, Mutiva avers that he did not know Boynton had been moved from clinical observation back to his regular cell earlier that day, nor that he remained on a KOP restriction.[3] Had he known that Boynton had a KOP restriction, Mutiva further represents that he would have ensured all medications were removed from his cell.

After plaintiff made a suicidal statement on the intercom at 8:00 p.m. on February 25, Sergeant Mutiva responded to Boynton's cell front, where he appeared to be chewing something and had an unknown medication in his hand. Mutiva contends that as soon as he drew his canister of OC spray Boynton immediately dropped the pills in his hand and spat the medication out of his mouth. Boynton disputes this, asserting that he already had all the medication in his mouth, which he then swallowed and handed out an empty pill bottle and packets to Mutiva.

Boynton was then taken to the Boscobel Hospital again on February 25th, where he reported to emergency department staff that he took 20 Tylenol pills and "some other stuff" at around 8:00 p.m. Although he complained of severe abdominal pain and appeared hypertensive, Boynton's vital signs were stable. Boynton's initial lab results showed an acetaminophen level of 44 micrograms per milliliter (ug/mL), which Dr. LaVoie describes

---

[3] The KOP restriction is documented in an internal memorandum dated February 26, 2020, regarding the incident that occurred on February 24, 2020. (Dkt. #28-1, at 58, 64.)

4

as "high," but opines was not high enough to constitute a serious medical condition. Nevertheless, the emergency department contacted poison control, which recommended starting Boynton on oral Mucomyst (n-acetylcysteine). Boynton was also subjected to a head CT scan and an abdominal x-ray, both of which were unremarkable. Labs were then drawn again after four hours and Boynton's acetaminophen level had dropped to 19 micrograms per milliliter (ug/mL), which was within the "normal range."

Around 4:00 a.m. on February 26, 2020, Boynton was next transferred from the Boscobel Hospital to Gundersen Health-La Crosse for additional evaluation and treatment. In particular, the plan was for Boynton to receive additional doses of Mucomyst and repeated labs. The attending physician at Gundersen noted that plaintiff was calm and in no acute distress. While staff at Gundersen also repeated lab tests, the results showed acetaminophen levels of less than 5 micrograms per milliliter (ug/mL).

Boynton was discharged on that same afternoon with no recommendations for continued treatment. Further, according to Dr. LaVoie's interpretation of the lab results, Boynton's liver had worked normally to detoxify or metabolize the acetaminophen without further medical intervention and, given that his levels had dropped to a normal range within four hours, the additional Mucomyst administered at Gundersen was wholly unnecessary.

OPINION

In his suit under 42 U.S.C. § 1983, plaintiff claims that defendant Kaeder-Schneider failed to protect him from self-harm on February 24, 2020, by continuing to pass out mail

after he expressed suicidal thoughts and failing to return to his cell to speak with him. Plaintiff claims further that defendant Mutiva failed to protect him from self-harm on February 25, 2020, because he knew that plaintiff had a KOP restriction, but failed to remove all medication from plaintiff's cell before he was released from clinical observation. Defendants have moved for summary judgment on plaintiff's claims, arguing that the evidence shows plaintiff did not ingest any pills on February 24, and did not ingest enough pills to pose a serious risk of harm on February 25. Defendants argue, therefore, that plaintiff's claims fail on the merits.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive summary judgment, however, the nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to [reach] a verdict in [his] favor." *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (citation and internal quotation marks omitted).

Although *pro se* litigants are entitled to liberal construction of their pleadings, they, too, have the burden to come forward in response to a motion for summary judgment with evidence that demonstrates a genuine issue of material fact. *Arnett v. Webster*, 658 F.3d 742, 760 (7th Cir. 2011) ("[A plaintiff's] pro se status doesn't alleviate his burden on summary judgment.") (citation omitted). Further, while the court views the record "in the

light most favorable to the nonmovant and constru[es] all reasonable inferences from the evidence in his favor," *Moore v. Western Ill. Corr. Ctr.*, 89 F.4th 582, 590 (7th Cir. 2023), a nonmovant is only entitled to favorable inferences that are supported by admissible evidence, not those based upon mere speculation or conjecture, *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017), or upon "[c]onclusory statements, not grounded in specific facts," *Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016).

I.   **Eighth Amendment Claim**

Here, plaintiff claims that the defendants are liable for violating his rights under the Eighth Amendment, which prohibits "cruel and unusual punishments" caused by deliberate indifference to conditions resulting in the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).  Although the Constitution does not mandate comfortable prisons, officials have a duty under the Eighth Amendment to provide "humane conditions of confinement" by ensuring that inmates receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Officials must further "take reasonable measures to guarantee the safety of the inmates" in their custody. *Id*.  When an Eighth Amendment claim is premised upon a failure to prevent harm, a plaintiff must show that he was "incarcerated under conditions posing a substantial risk of serious harm" and that prison officials were deliberately indifferent to that risk. *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001) (citing *Farmer*, 511 U.S. at 834).

Deliberate indifference depends on the defendant's subjective state of mind. *McDaniel v. Syed*, 115 F.4th 805, 832 (7th Cir. 2024).  To demonstrate deliberate

7

indifference, therefore, a prisoner must show that the defendant "'*actually* knew of and disregarded a substantial risk of harm.'" *Id*. (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc) (emphasis in original). In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

For these reasons, proof of deliberate indifference is a "'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 615 (7th Cir. 2022) (quoting *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020)). "Negligence or even objective recklessness — the 'fail[ure] to act in the face of an unjustifiably high risk that is so obvious that it *should* be known' — is not enough to satisfy this standard. *McDaniel*, 115 F.4th at 832 (quoting *Petties*, 836 F.3d at 728 (emphasis in original). Instead, evidence of "callous disregard" for inmate wellbeing is required to make out an Eighth Amendment claim. *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022).

Finally, self-inflicted harm may constitute "serious harm" for purposes of the Eighth Amendment. *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012). A prison official can be held liable under the Eighth Amendment for self-inflicted harm committed by a prisoner if the official "subjectively knew" the prisoner was at "substantial risk" of self-harm, but intentionally disregarded that risk. *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006). To prevail on such a claim, however, the plaintiff must show that the defendant prison official "knew of a significant likelihood that the inmate would imminently attempt" self-harm or suicide, then "failed to take reasonable steps to prevent

8

it." *Davis-Clair v. Turck*, 714 F. App'x 605, 606 (7th Cir. 2018).  Further, a "risk of future [self-harm] must be 'sure or very likely' to give rise to 'sufficiently imminent dangers' before an official can be liable for ignoring that risk." *Id*. (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008) (Roberts, C.J., plurality op.) (emphasis omitted); *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993)).

### A. Claims Against Defendant Kaeder-Schneider

While defendant Kaeder-Schneider disputes that plaintiff advised her that he was having suicidal thoughts on February 24, 2020, the court must assume he did so for purposes of summary judgment.  However, the mere mention of "suicidal thoughts" is not enough to put a reasonable officer on notice of a substantial risk of imminent harm without a more concrete threat or at least a credible, specific threat of self-harm.  *Collins*, 462 F.3d at 761.  Indeed, an officer is entitled to exercise reasonable discretion in assessing such a risk.  *Id*.

However, even if plaintiff had expressed specific intentions of committing self-harm to Kaeder-Schneider, he still cannot establish liability under the Eighth Amendment because there is no dispute that lab tests taken at the Boscobel Hospital on February 24 turned out to be "normal," refuting plaintiff's claim that he ingested any acetaminophen, much less that he was at a substantial risk of serious harm that day.  (Dkt. #37, at 14-15 ¶¶ 32-33.)  As a result, there is no evidence from which a reasonable jury could conclude that defendant Kaeder-Schneider is liable for disregarding a risk of serious harm to plaintiff on February 24, 2020.  *See Farmer*, 511 U.S. at 834 (the plaintiff must show that the defendant deliberately disregarded a "substantial risk of serious harm").  Moreover,

9

because plaintiff does not otherwise allege facts showing that defendant Kaeder-Schneider had any involvement with the events that occurred on February 25, 2020, she is entitled to summary judgment on his claims concerning both incidents.

### B. Claims Against Defendant Mutiva

Plaintiff's Eighth Amendment claims against defendant Mutiva fail as well. Plaintiff agrees that he did not advise Mutiva of any intention to self-harm on February 24, 2020, and there is no evidence that Mutiva was aware of any risk to plaintiff's health or safety on that day. (Dkt. #37, at 7-8 ¶¶ 15-16.) Because no reasonable jury could conclude that defendant Mutiva was deliberately indifferent to a risk that plaintiff would self-harm on February 24, 2020, Mutiva is entitled to summary judgment on this claim.

Plaintiff also cannot prevail on an Eighth Amendment claim against defendant Mutiva regarding the events of February 25, 2020. As an initial matter, there is no dispute that plaintiff was placed in clinical observation following his visit to the Boscobel Hospital on February 24, 2020, nor that he was released from observation status to return to his cell in Alpha Unit at *9:10 a.m.* on February 25. (Dkt. #37, at 11 ¶ 24.) Because it is also undisputed that Mutiva did not report for work until five hours later at 2:00 p.m., plaintiff cannot show that Mutiva failed to clear his cell of any KOP medication that may have remained there *before* his release from clinical observation.

Although plaintiff also represents in response to defendants' summary-judgment motion that he advised Sergeant Mutiva and an unidentified clinician over the intercom at 4:00 p.m. that he had medication in his cell that was left over from the previous day's "overdose attempt" (Boynton Decl. (dkt. #32) ¶¶ 3-4), plaintiff still cannot succeed. First,

10

there are records *contradicting* plaintiff's claim. Specifically, when he was evaluated by a psychologist in clinical observation on February 26, plaintiff admitted to the clinician that he did not advise staff that he was having thoughts of self-harm. (Dkt. #28-1, at 60.) Second, plaintiff does not allege that he took any medication until 8:00 p.m. on February 25, 2020, after which he was promptly transported to the Boscobel Hospital for evaluation. (Boynton Decl. (dkt. #32) ¶ 6.) Moreover, by the time defendant Mutiva approached his cell and asked what was in his mouth, plaintiff concedes that he "was unable to do anything to stop [plaintiff]" from ingesting the pills. (*Id*.) Third, while lab tests taken on the night of February 25 showed that plaintiff's acetaminophen levels were high, additional lab tests taken just four hours later showed his levels had returned to within a normal range. (Dkt. #37, at 17-18 ¶ 39.) Similarly, plaintiff concedes he was treated briefly at Gundersen Health-La Crosse, then discharged the following afternoon without any recommendations for follow-up care. (Dkt. #37, at 19 ¶ 43.) Finally, while plaintiff's lab tests were briefly high, Dr. LaVoie explains that his acetaminophen levels had already dropped to within normal range without receiving an additional oral dosage of Mucomyst at Gundersen, and there is no indication that he ever ingested enough of any medication to constitute an objectively serious medical condition. (Dkt. #37, at 20-21, ¶ 45.)

Still, plaintiff claims in an unsworn response to the summary-judgment motion that he later developed GERD (gastroesophageal reflux disease), and he had to go on a "no added salt diet for nearly a year." However, he provides *no* medical records in support and does not show that either condition was *caused* by the events of February 25, 2020. (Dkt.

11

#30, at 3.) As importantly, he points to no evidence that would refute Dr. LaVoie's medical opinion that his condition never became serious enough to pose a risk of harm.

Because there is no evidence showing plaintiff suffered serious harm as a result of the medication he consumed, plaintiff cannot recover damages stemming from the events of February 25. *See Farmer*, 511 U.S. at 834; *see also Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020) (The risk posed by officers ignoring a threat of suicide "is not compensable without evidence of injury[.]"); *Turner v. Boughton*, No. 19-cv-1001-jdp, 2023 WL 4930102, at *6-7 (W.D. Wis. Aug. 2, 2023) (granting summary judgment on claims that an officer disregarded a risk of suicide because plaintiff failed to show he was harmed after consuming 25 to 30 ibuprofen tablets and other medication). Accordingly, Mutiva is entitled to summary judgment in his favor.

## II. Qualified Immunity

The defendants have asserted an alternative defense of qualified immunity, which protects government officials from liability for damages unless they "violate clearly established statutory or constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once the defense is raised, a plaintiff bears the burden of defeating it by showing that: (1) the defendants violated a constitutional right; and (2) the constitutional right was clearly established at the time of the violation. *Garcia v. Posewitz*, 79 F.4th 874, 778 (7th Cir. 2023). "If either inquiry is answered in the negative, the defendant official is

entitled to summary judgment." *Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1044 (7th Cir. 2023) (citation and internal quotation marks omitted).

Plaintiff has not shown that either defendant Kaeder-Schneider or defendant Mutiva violated his constitutional rights by deliberately ignoring an objectively serious threat to his health that resulted in harm. Because both defendants are entitled to qualified immunity, the court will grant their motion for summary judgment for this additional reason and will dismiss this case.

## ORDER

IT IS ORDERED that:

1. The motion for summary judgment filed by defendants Elizabeth J. Kaeder-Schneider and Matthew Mutiva (dkt. #23) is GRANTED.

2. This case is DISMISSED WITH PREJUDICE and the clerk of court is directed to enter judgment for the defendants.

Entered this 3rd of January, 2025.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge